IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

CHERYL VARESE, an individual,

    Plaintiff,

vs.

CLATSOP BEHAVIORAL HEALTHCARE,
SUMUER WATKINS and NICK BENAS,

    Defendants.

Case No. 3:16-cv-00738-AA
**OPINION AND ORDER**

AIKEN, Judge:

Plaintiff Cheryl Varese brings this wrongful termination and retaliation action against her former employer and supervisors, alleging defendants violated provisions of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*; the Oregon Family Leave Act ("OFLA"), Or. Rev. Stat. § 659A.183; Oregon's whistleblower retaliation statute, *id.* §§ 659A.199 and

659A.230; and Oregon's employment discrimination statute, *id.* § 659A.030.[1] Before me is defendants' motion for summary judgment. For the reasons set forth herein, defendant's motion is granted in part, as to plaintiff's FMLA claim only. I decline to exercise supplemental jurisdiction over plaintiff's state law claims and dismisses those claims without prejudice.

## BACKGROUND

Defendant Clatsop Behavioral Healthcare ("CBH") is a mental healthcare agency located in Clatsop County, Oregon. In May 2013, plaintiff was hired as the Program Director of CBH's Developmental Disability ("DD") Program. Plaintiff's supervisors at CBH were defendants Sumuer Watkins and Nick Benas, who served as CBH's Executive Director and Director of Business Operations, respectively. In 2014, plaintiff received a yearly performance evaluation in which her evaluator found she met expectations in every category of assessment. Also in 2014, plaintiff requested sexual harassment training to address the behavior of one subordinate staff member. Aside from that isolated request, neither party reports any workplace issues or personnel challenges prior to 2015.

In April 2015, a series of events caused tensions to rise between the parties. On April 22, 2015, a CBH employee, who was plaintiff's housemate, resigned after allegedly being sexually harassed by a CBH co-worker for several months. Later that same day, another CBH employee, with whom plaintiff associated, was terminated after attempting to intervene on behalf of the employee who had resigned. The two former CBH employees subsequently filed administrative and legal complaints for employment-related claims, including discrimination complaints. Plaintiff later informed defendants Watkins and Benas that she was friends with those and other former CBH employees.

---

[1] Plaintiff has conceded summary judgment as to the additional claims pled in her original complaint. Pl.'s Resp. Opp. Defs.' Mot. Summ. J. 42 n. 14 (doc. 61) ("Pl.'s Resp.").

Page 2 - OPINION AND ORDER

In late April 2015, plaintiff called the Council Representative for the Union which represents non-management CBH employees.[2] Plaintiff neither concedes nor denies the occurrence and content of the phone call to the Union Council Representative; none of the documents filed by plaintiff address this call.[3] According to the Union Council Representative, plaintiff called and explained that CBH employees were upset with executive leadership and further "stated that it would be 'very smart' for the Union to take a no-confidence vote" against Watkins and Benas. Simpson Decl. ¶ 7. Plaintiff allegedly expressed her understanding that such a vote would result in the removal of Benas and Watkins from their executive positions.

Defendants also allege that on May 13, 2015, plaintiff spoke with the Union Chapter Chair and similarly requested a no-confidence vote against Watkins and Benas. Again, plaintiff neither concedes nor denies that any such conversation took place.[4] The Union Chapter Chair contacted the Union Council Representative to express concern regarding plaintiff's request, which the Chapter Chair felt was "inappropriate." Louder Decl. ¶ 6; Simpson Decl. ¶ 9. Thereafter, the Union Council Representative contacted Watkins to inform her about plaintiff's

---

[2] As management and executive personnel at CBH, respectively, plaintiff, Watkins, and Benas were not members of the union.

[3] The independent investigator hired by CBH in July 2015 reports that when he interviewed plaintiff, she denied speaking to the Union Council Representative about a no-confidence vote. According to Watkins and the investigator, plaintiff maintained that she had contacted the Union Council Representative in order to work with the Union toward better collaborative relations. Watkins reports that during a meeting with plaintiff on June 22, 2015, plaintiff "acknowledged" that she had contacted the Union Council Representative in April, but was "non-committal" about what was said. Watkins Decl. ¶ 10.

[4] One of the exhibits plaintiff submitted in support of her opposition to summary judgment is a July 10, 2015 letter from the Union Chapter Chair to Watkins and Benas. That letter describes plaintiff's communication on May 13, 2015 and states that plaintiff suggested "inciting the Union" to pursue a no confidence vote. Stephenson Decl. Ex. 19 at 71, Dec. 21, 2017.

no-confidence vote requests. The Union Chapter Chair was one of plaintiff's subordinates and the same individual whose behavior had prompted plaintiff to request sexual harassment training in 2014.

Defendants claim that in the spring of 2016, they began receiving "vague" complaints about the DD Program. Watkins Decl. ¶ 7. The only subject of the complaints identified by defendants is that plaintiff had apparently suggested a client be transferred to a non-CBH therapist. Watkins expressed concern that plaintiff had "not adequately investigated whether CBH could provide those services in-house," which is preferred in order to "provide the highest quality of care" for its clients. Watkins Decl. ¶ 7. Watkins also expressed doubt regarding plaintiff's qualifications for making such determinations regarding clients' mental health treatment.

On June 22, 2015,[5] defendants Watkins and Benas met with plaintiff. Plaintiff reports that, at the meeting, Watkins and Benas threatened her employment after plaintiff acknowledged that she continued to be friends and housemates with the former employee who had resigned on April 22. Defendants report that, at the meeting, they discussed Varese's referral of a client to a non-CBH therapist, general complaints received regarding the DD Program, and expectations for areas on which plaintiff was to focus moving forward. Defendants also raised plaintiff's purported contact with Union representatives and her alleged requests for a no-confidence vote against them. "In no uncertain terms, [Watkins] told Ms. Varese that management-level employees were expected not to undermine CBH management to the Union." *Id.* ¶ 10. Defendants maintain that they neither threatened plaintiff's job nor attacked her character, and that the exchange was professional.

---

[5] June 22, 2015, was also the day that CBH receive notification that the former CBH employee who resigned on April 22, 2015, had retained an attorney.

Page 4 - OPINION AND ORDER

On July 7, 2015, a meeting took place between plaintiff, defendants, and plaintiff's four staff subordinates. Plaintiff declares "the fact of the meeting alone was strange," and indicates that she had expected a private meeting with Watkins. Varese Decl. ¶ 8. Defendants characterize the meeting as a weekly DD Program staff meeting, though they concede that this meeting was scheduled at a time that was different than usual. Plaintiff and defendants describe the meeting as "tense" and "heated," respectively. Varese Decl. ¶ 8; Watkins Decl. ¶ 12; Benas Decl. ¶ 4, Nov. 13, 2017. One or more of plaintiff's subordinates questioned whether management had instructed plaintiff to "randomly write up" employees absent a violation of CBH policy. Watkins Decl. ¶ 12; Benas Decl. ¶ 4, Nov. 13, 2017; *see also* Varese Decl. ¶ 8. Benas responded that he had not so directed plaintiff. Plaintiff maintains that she had been directed to write up one staff subordinate for absences associated with medical leave, which instruction she believed to be illegal. Defendants and others present at the meeting aver that plaintiff ultimately apologized for saying that defendant Benas had directed her to write up subordinates.[6]

On the morning following the DD Program meeting, July 8, 2015, plaintiff sent two email messages to defendants. In the first message, plaintiff stated that she would be filing a formal complaint regarding the July 7 meeting, which she alleged had been "a direct attack against my character," "resulted in a hostile work environment," and was "retaliatory in nature due to my affiliation and association with previous employees that are no longer with CBH." Stephenson Decl. Ex. 15 at 26, Dec. 21, 2017. That first email was addressed to Watkins and Benas and copied to CBH's Board President, as well as to two other Clatsop County employees. Approximately four hours later, plaintiff sent another email to solely Watkins and Benas in

---

[6] In her response brief, plaintiff contends that she "eventually sarcastically agreed . . . in order to move on." Pl.'s Resp. 12.

Page 5 - OPINION AND ORDER

which she reported three of her subordinate staff discussing personal sexual matters and referring to clients in disparaging terms. The second email focused primarily on allegedly inappropriate statements made by the Union Chapter Chair.

Benas responded via email to plaintiff's first message the following morning, July 9, stating, "We take these formal complaints very seriously. We will have an investigator following up promptly." Benas Decl. Ex. 3, Nov. 13, 2017. Also on July 9, three of plaintiff's subordinates—including the Union Chapter Chair—submitted a joint letter to Watkins expressing their concerns about the "hostile work environment we are in due to the actions of our supervisor, Program Manager Cheryl Varese." Louder Decl. Ex. 5. The three staff requested "protection from Ms. Varese's retaliatory actions and removal of her as Program Manager immediately." *Id.*

The next day, July 10, CBH retained David Hepp to conduct an independent investigation of plaintiff's complaint. Both parties agree that CBH Board President hired Hepp; neither Watkins nor Benas participated in the selection process or decision to hire Hepp. In written correspondence with Hepp, the CBH Board President indicated that Benas would provide additional information and serve as a point of contact. Between July 10 and July 14, Hepp interviewed Watkins, Benas, the Union Council Representative, the three subordinates who had written to request plaintiff be removed from her position, another CBH employee whom the plaintiff had formerly supervised, and the plaintiff herself. In his declaration, Hepp noted that, "[a]lthough I typically interview the complainant before the other witnesses," he interviewed the plaintiff last, on July 14, because she was out of the office attending a training. Hepp. Decl. ¶ 11. Hepp did not interview plaintiff's fourth subordinate because that staff member was on medical leave at the time of the investigation.

Hepp's investigation yielded divergent recollections or inconsistent reports of events by various interviewees. For example, on July 13, Hepp interviewed the Union Council Representative, who told Hepp that the plaintiff had contacted her around the third week of April and recommended that the Union take a no-confidence vote against CBH executive management. When he interviewed the plaintiff on July 14, however, Hepp reports that the plaintiff told him "she had not spoken to Ms. Simpson about a no-confidence vote[.]" Hepp. Decl. ¶ 20. Multiple times in his declaration, Hepp concludes that plaintiff "lied." *Id.* ¶¶ 21, 26, 29, 31.

Plaintiff contests the impartiality of the investigation carried out by Hepp. Benas and Watkins helped facilitate scheduling interviews and provided Hepp with various documents. Plaintiff points out that by the time Hepp interviewed plaintiff on July 14, 2015, Hepp had spent more than twenty hours on the investigation; in plaintiff's estimation, he "had already made up his mind[.]" Varese Decl. ¶ 12. In particular, plaintiff highlights that, in his notes, Hepp referred to the plaintiff with the delta symbol ("Δ"), which is commonly used as legal shorthand to denote a defendant. Hepp acknowledges in his declaration that "[a]lthough I was initially retained to investigate Ms. Varese's complaints, I discovered complaints about Ms. Varese's conduct during the course of my investigation." Hepp Decl. ¶ 38.

On July 17, 2015, plaintiff met with a doctor regarding anxiety, sleep loss, and other manifestations of "severe work-related stress." Varese Decl. Ex. 14. Plaintiff's doctor prescribed a week off of work. On Sunday, July 19, plaintiff emailed CBH's acting human resources staff person,[7] Pam Dean, to alert her that plaintiff would be absent for the week and that she had a doctor's note she could bring when she returned the following Monday. On July 20, Dean emailed plaintiff paperwork for FMLA-protected medical leave and short-term

---

[7] CBH's long-term HR manager was on leave from June 2015 through August 2015.

disability, though plaintiff had not expressly requested that information. Dean copied Benas on the email message containing the attached FMLA paperwork, and Benas does not appear to have responded to or contested the conveyance of FMLA forms to the plaintiff. On July 24, plaintiff emailed Dean requesting workers compensation paperwork, which Dean sent on the same day.[8] Dean forwarded that request to Benas and Watkins.

On July 23, 2015, during the week that plaintiff was out of the office, Benas received a copy of the Hepp's investigative report from CBH's Board President. In the final investigation report, Hepp set forth "statements, documents, and evidence" in support of his conclusion that "Varese underm[es] management authority and mission . . . and [was] untruthful" during her investigation interviews. Hepp Decl. Ex. 14 at 3. Benas declares that he made the decision to terminate plaintiff's employment "[a]fter reviewing Mr. Hepp's report, and based on Mr. Hepp's conclusions[.]" Benas Decl. ¶ 11, Nov. 13, 2017. Benas further reports that because plaintiff was out sick that week, he decided to notify her the following Monday, July 27. On July 26, 2015, Benas ordered plaintiff's final paycheck and drafted the termination letter.

At 8:33am on July 27, 2015, Benas called the plaintiff to inform her that her employment had been terminated.[9] Benas left a voice message in which he read aloud the prepared termination letter. At 8:39am, Benas emailed all CBH staff to inform them that plaintiff's employment had been terminated. Benas then sent the termination letter to the plaintiff via certified mail. Meanwhile, at 8:56am, plaintiff faxed her completed workers compensation and short-term disability forms to Dean. Plaintiff declares that "[w]ithin hours after sending in the

---

[8] Dean notes that plaintiff's "request was a surprise to me, as I was not aware of her reporting any injuries related to work." Dean Decl. ¶ 6.

[9] Benas' declaration indicates that the plaintiff did not return to work as expected on Monday, July 27, so he decided to call her because he "did not want to delay letting her know that her employment had been terminated[.]" Benas Decl. ¶ 14.

Page 8 - OPINION AND ORDER

forms," she received the voicemail from Benas notifying her of termination. Varese Decl. ¶ 15. Benas instructed Dean to forward the plaintiff's workers compensation form to CBH's insurance provider; no further action was taken with regard to plaintiff's short-term disability paperwork.

Plaintiff filed this action on April 29, 2016. Defendants moved for summary judgment on November 13, 2017.

## STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine issue of material fact. *Id.*; *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving parties favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008).

## DISCUSSION

To establish that an employer interfered with an employee's right to take FMLA leave, employee-plaintiffs must meet the five elements of a prima facie FMLA interference claim: "the employee must establish that: (1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to

which he was entitled."[10] *Sanders v. City of Newport*, 657 F.3d 772, 778 (9th Cir. 2015) (adopting the test set out in *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006)). The first three elements are uncontested in this case.

Defendants contend that they are entitled to summary judgment on plaintiff's FMLA claim on two bases. First, defendants argue that plaintiff did not provide sufficient notice of her need for FMLA-protected medical leave. Second, defendants argue that plaintiff has not met the burden of demonstrating by a preponderance of the evidence that CBH's termination of her employment was in retaliation for plaintiff's medical leave, such that plaintiff's medical leave was a "negative factor" in CBH's decision to terminate plaintiff's employment. 29 C.F.R. § 825.220(c).

---

[10] The FMLA expressly prohibits employers from interfering with or discriminating against employees who take protected medical leave. 29 U.S.C. § 2615(a). In the Ninth Circuit, FMLA discrimination/retaliation claims under 29 U.S.C. § 2615(a)(2) are limited to situations in which an employee alleges that the employer retaliated against her because she "oppose[d] employer practices made unlawful by FMLA." *Xin Liu v. Amway Corps.*, 347 F.3d 1125, 1133 n.7 (9th Cir. 2003) (emphasis omitted). By contrast, the Ninth Circuit has held that when an employee alleges an employer retaliated against her for taking FMLA leave, she had stated a claim for FMLA interference, under 29 U.S.C. § 2615(a)(1). *See Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001) ("By their plain meaning, the anti-retaliation or anti-discrimination provisions do not cover visiting negative consequences on an employee simply because he has used FMLA leave. Such action is, instead, covered under § 2615(a)(1)[.]") (internal citations omitted); *see also Xin Liu*, 347 F.3d at 1133 n.7 (observing that, in the Ninth Circuit, "§ 2615(a)(1) applies to employees who simply take FMLA leave and as a consequence are subjected to unlawful actions by employees who simply take FMLA leave and as consequence are subjected to unlawful actions by the employer") (citing *Bachelder*, 259 F.3d at 1124). The U.S. Department of Labor regulations regarding interference with FMLA-protected medical leave specifically state that "employers cannot use the taking of FMLA leave as a negative factor in employment actions." 29 C.F.R. § 825.220(c).

Plaintiff pleads a claim for FMLA "interference, discrimination and/or retaliation[.]" Pl.'s Compl. at 7 (capitalization normalized). Because she alleges that she was discriminated against for taking medical leave and does not allege that defendant retaliated against her for opposing its FMLA policies, her claim is properly analyzed as an FMLA interference claim under 29 U.S.C. § 2615(a)(1).

I.   *FMLA Notice Requirement*

Defendants challenge the sufficiency of plaintiff's notice to CBH of her intent to take protected leave. When an FLMA-eligible employee has an unforeseeable need for medical leave, U.S. Department of Labor regulations require her to provide notice to her employer "as soon as practicable." 29 C.F.R. § 825.303(a). "As soon as practicable means as soon as both possible and practical, taking into account all of the facts and circumstances in the individual case." *Id.* § 825.302(b). An employee is not required to affirmatively invoke the FMLA in her notice of need for medical leave. *Id.* § 825.303(b). Rather, "[a]n employee shall provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." *Id.* § 825.303(b). Once the employee provides such notice, the burden is then on the employer to "inquire further . . . and obtain the necessary details of the leave to be taken." *Id*; *see also Bachelder*, 259 F.3d at 1130 ("[I]t is the employer's responsibility, not the employee's, to determine whether a leave request is likely to be covered by the Act."). However, simply "[c]alling in 'sick' without providing more information will not be considered sufficient notice to trigger an employer's obligations" under FMLA. 29 C.F.R. § 825.303(b). Whether an employee's notice of medical leave constitutes sufficient notice to an employer under the FMLA is a question of fact. *See, e.g., Phillips v. Mathews*, 547 F.3d 905, 909 (8th Cir. 2008) ("Whether an employee gave sufficient information to put his or her employer on notice that an absence may be covered by the FMLA is a question of fact for the jury."); *Price v. City of Fort Wayne*, 117 F.3d 1022, 1026 (7th Cir. 1997) ("Whether [the employee] gave the notice required is necessarily a question of fact, linked to her illness and its manifestations.")

Here, plaintiff notified her employer on a Sunday that she would be out the following week. In her notification email to CBH's acting human resources staff person, plaintiff

Page 11 - OPINION AND ORDER

mentioned that she had a doctor's note, which she could produce when she returned to work the following week. Plaintiff had met with her doctor two days prior, on a Friday, which was when she received the prescription for time off. In her email notifying the defendant of her absence, plaintiff did not expressly mention medical leave, nor did she affirmatively invoke the FMLA. Yet defendant CBH's acting human resources staff person responded to plaintiff's notice by emailing the plaintiff FMLA paperwork to fill out and send back.

A reasonable juror could conclude that CBH was on constructive notice, if not actual notice, that the plaintiff had requested FMLA-protected medical leave. Both parties concede that plaintiff was eligible for and entitled to such leave. Though plaintiff could have chosen to notify defendant earlier than Sunday, July 19, after receiving the doctor's order on Friday, July 17, plaintiff likely met the "as soon as practicable" regulatory standard by notifying defendant by the next business day. *Cf.* 29 C.F.R. § 825.302 (providing that, when an employee learns she will need FMLA leave within the next thirty days, that employee should be able to provide notice "either the same day or the next business day"). Moreover, plaintiff did more than merely call in sick; she expressly offered to produce a doctor's note upon her return to work. Significantly, CBH's conveyance of FMLA paperwork to the plaintiff following her medical leave notification strongly suggests that plaintiff provided enough information for CBH to determine that FMLA might apply. A reasonable juror could interpret defendant CBH's act of sending the plaintiff FMLA paperwork as recognition and acceptance of sufficient notice.

Viewing the facts and drawing all inferences in the light most favorable to the nonmoving party, a genuine issue of material fact exists as to the sufficiency of plaintiff's medical leave notice. Reasonable jurors could find that plaintiff's notice was sufficient under FMLA.

II.  *FMLA Retaliation Claim*

Defendants next challenge plaintiff's allegation that she was terminated in retaliation for the medical leave she took during the week prior to termination of her employment. In order prove causation for an FMLA claim, an employee-plaintiff must prove by a preponderance of the evidence that use of FMLA-protected leave was a "negative factor" in the employer-defendant's decision to terminate.[11] *Bachelder*, 259 F.3d at 1125; *see also Schultz v. Wells Fargo Bank, NA*, 970 F. Supp. 2d 1039, 1053 (D. Or. 2013). A plaintiff may use direct or circumstantial evidence to establish that protected leave constituted a negative factor. *Bachelder*, 259 F.3d at 1125. "Temporal proximity between protected activity and an adverse employment action can by itself constitute sufficient circumstantial evidence of [causation] in some cases." *Bell v. Clackamas Cty*, 341 F.3d 858, 865 (9th Cir. 2003) (addressing timing and retaliation in the context of Title VII, 42 U.S.C. 2000e *et seq.*). However, temporal proximity alone is not sufficient to establish prima facie retaliation if the timing "does nothing to refute . . . the proffered legitimate reasons" for the adverse employment action. *Hashimoto v. Dalton*, 118 F.3d 671, 680 (9th Cir. 1997).

Here, plaintiff was terminated following an independent investigation commissioned after plaintiff filed a formal complaint against defendants. The investigation report concluded that plaintiff had been untruthful and actively sought to undermine CBH management authority. Setting aside whether the investigator's conclusions were accurate or impartial, Benas made the decision to terminate plaintiff's employment on the same day he received the report.

Moreover, the investigation report in effect represented the culmination of a series of

---

[11] Unlike some other circuits, the Ninth Circuit has expressly declined to apply the burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to FMLA termination cases. *See Xin Liu*, 347 F.3d at 1136 (explaining that "where an employee is subjected to 'negative consequences . . . simply because he had used FMLA leave,' the employer has interfered with the employee's FMLA rights under 29 C.F.R. § 825.220(a)(1)") (citing *Bachelder*, 259 F.3d at 1124-25).

Page 13 - OPINION AND ORDER

actions showing that plaintiff's continued at-will employment with CBH was (at best) on shaky ground prior to her period of medical leave. On June 22, 2015, Benas and Watkins requested a meeting with plaintiff to discuss, among other concerns, reports that plaintiff had encouraged a no-confidence vote against Benas and Watkins by the Union representing CBH employees, which, if executed, would have had the effect of ejecting Benas and Watkins from their positions at CBH. Plaintiff herself alleges that defendants threatened her employment at the meeting. In addition, defendants received a letter on July 9 from three of the plaintiff's four subordinate staff members requesting that she be removed from her position. All of those events occurred prior to plaintiff taking or notifying CBH that she planned to take protected medical leave.

Given the foregoing facts, this is not a case in which the temporal proximity between the protected activity and the adverse employment action constitutes sufficient evidence of causation. Instead, the summary judgment record demonstrates that plaintiff was on the road to termination well before she invoked her right to protected medical leave and irrespective of her decision to do so. Moreover, plaintiff has introduced no evidence other than temporal proximity to bolster her claim that her leave was a negative factor in the employment decision. Even when viewing the facts and drawing inferences in the light most favorable to the nonmoving party, the temporal proximity between the plaintiff's leave and the termination decision "does nothing to refute" defendants' stated reasons for terminating plaintiff's employment. *Hashimoto*, 118 F.3d at 680. Defendants are thus entitled to summary judgment on plaintiff's FMLA claim.

## SUPPLEMENTAL JURISDICTION OVER PENDENT STATE LAW CLAIMS

I need not consider plaintiff's remaining state law claims against defendants as I decline to exercise supplemental jurisdiction over those claims. 28 U.S.C. § 1367 provides the basis for supplemental jurisdiction:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

I have discretion to "decline to exercise" supplemental jurisdiction in various circumstances, including when "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

That is exactly the situation at bar. Here, supplemental jurisdiction over the state law claims was based on federal question jurisdiction over the federal claims: alleged violations of the FMLA and the Americans with Disabilities Act. Plaintiff has conceded summary judgment as to the latter claim and I am granting summary judgment on the former claim. In such instances, the Ninth Circuit encourages district courts to "decline jurisdiction over state claims and dismiss them without prejudice." *Les Schockley Racing Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 509 (9th Cir. 1989). Interpretation of state statutes is best left to a state court. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."). I therefore decline to exercise supplemental jurisdiction over plaintiff's remaining state law claims and dismiss them without prejudice.

## CONCLUSION

Defendant's motion for summary judgment (doc. 42) is GRANTED in part, as to plaintiff's FMLA claim and as to the six claims on which plaintiff concedes defendants are

entitled to summary judgment.[12] I decline to exercise supplemental jurisdiction over the remaining state law claims and dismiss them without prejudice. The parties' request for oral argument is denied as unnecessary.

IT IS SO ORDERED.

Dated this 27th day of March 2018.

*Ann Aiken*
Ann Aiken
United States District Judge

---

[12] Plaintiff concedes defendants are entitled to summary judgment on plaintiff's claims alleging (1) federal disability discrimination under Title I of the Americans with Disabilities Act, 42 U.S.C. § 12111, *et seq.*; (2) state disability discrimination under Or. Rev. Stat. § 659A.112; (3) state disability retaliation under Or. Rev. Stat. § 659A.109; (4) failure to accommodate a disability under Or. Rev. Stat. § 659A.112 and § 659A.118; (5) wrongful discharge under Or. Rev. Stat. § 659A.183, Or. Admin. R. 839-009-0200, *et seq.*, and 29 U.S.C. § 2601, *et seq.*; and (6) associational discrimination under Or. Rev. Stat. § 659A.030.

Page 16 - OPINION AND ORDER